New Eureka Amusement Company *v.* Rosinsky, Appellant.

Argued October 16, 1936.

446

Before KELLER, P. J., CUN-
NINGHAM, BALDRIGE, STADTFELD, PARKER, JAMES and
RHODES, JJ.

*Daniel Marcu,* with him *Raymond Heimlich* and
*Josef Jaffe,* for appellant.

*George M. Kevlin,* with him *Frank Rogers Donahue,*
of *Donahue, Irwin, Merritt & Gest,* for appellee.

OPINION BY JAMES, J., April 15, 1937:

This is an action of assumpsit brought by the plain-
tiff corporation, lessee, to recover the sum of $928.50,
the balance of a sum of $1,500 deposited by it, as liqui-
dated damages, to secure the faithful performance of
the terms of the lease entered into with the defendant,
lessor. The amount sued for represented the $1,500
deposit and the amount realized from the constable's
sale, less the rent due for the months of January and
February and March, 1934. At the trial, defendant
offered no defense but submitted a point for binding
instructions. The jury rendered a verdict for plain-
tiff, whereupon defendant filed a motion for judgment
n. o. v. and for a new trial, both of which were refused,
judgment entered on the verdict and this appeal fol-
lowed.

In passing upon the motion for judgment n. o. v. the

question for this court to determine is whether there are facts in evidence which, if unanswered, would justify men of ordinary reason and fairness in affirming the question which the plaintiff is bound to maintain: *Knight v. Gulf Refining Co.*, 311 Pa. 357, 166 A. 880.

On December 16, 1933 the lessee corporation, by its president, George Sobel, and its secretary-treasurer, J. M. Frere, entered into a lease with the lessor for a term of five years from December 18, 1933, for a theatre at a total rental of $20,400, payable in advance at the rate of $325 per month. The first month's rent was paid on December 16, 1933. On January 16, before the next month's rent became due, Frere and Sobel went to the lessor and explained to him that the theatre receipts were such as to make it impossible to pay the month's rent. Lessor stated that he expected the rent, but after the explanation by the lessee's officers, he said, "All right, go back to the theatre and I will be out to see you," but did not specify any particular time. During the week of February 11, 1934, Frere and Sobel, accompanied by Mr. Kevlin, their attorney, again went to the lessor and explained to him that they could not pay the back rent or the rent for the month of February, about due, and that they did not know when they would be able to pay that rent or the rent accruing in the future, and unless the lessor was willing to wait for his rent, they would have to give up the operation of the theatre. According to their testimony they also told the lessor that in order to continue they would have to borrow the money, but would not borrow the money unless they were sure they would stay in the theatre. Frere testified as follows: "As I remember, he [lessor] left us saying he still needed money, but at the same time he said he would go along with us; that we would not worry or have to worry—whether he used the word 'worry,' I don't know, because we were worried and

we were trying to get the money for him, and we left him with the understanding, for Mr. Kevlin made that clear......" He was asked on direct-examination the following question: "Q. Did I understand you correctly to say that at the interview that you had with the defendant, about February 11th, the defendant told you and your associate in the Amusement Company, that he would not exercise his rights under the lease? A. That is right." On the question of borrowing money, he testified: "Q. Did you borrow money? A. We did borrow money. Q. And you did continue— A. Yes, we did. Q. For how long? A. One month after that. Q. When you left Mr. Rosinsky, were you in agreement as to his waiving the rent payments for the one month due and the money to become due and for an indefinite period until the theatre was capable of earning the money? A. We had not definitely decided on what the rent would be reduced to. While we talked about that for the future, there was nothing definite decided on, but as we left Mr. Rosinsky that night I felt there was no longer any need to concern ourselves. ...... A. After telling him we could not pay the rent we left him with the understanding that he would go along with the business. Q. Agreed to go along with the business? A. That is right. Q. How go along, in what way? A. To go along without any further worry about the rent until conditions got to a point where the theatre increased enough to pay him the rent."

Sobel testified that the lessor said at the meeting of February 11: "So Mr. Kevlin, by the way, was talking about the rent to Mr. Rosinsky, and he told him, 'Mr. Rosinsky, unless you promise to go along with us in this matter, cooperate until we reach a position where we are able to pay the rent, we cannot go along. As a matter of fact, the boys have put in every nickel they have. Unless you go along, they must move out.' We had to go out and borrow money at that time and un-

less Mr. Rosinsky promised to go along with the rent, we would not have done it. (The court) What did he say? A. He finally says—he said, 'All right, boys, you go ahead; you continue right along and I will never take any action. I will not take any action unless I tell you first, notify you about it.' So we went back to the theatre and felt all right about it, that everything was settled." Later he testified: "Q. When did you tell Mr. Rosinsky you would be able to pay him the rent? A. Not until the theatre reached a point where it would pay for the expenses; where it was able to pay the rent. In other words, not until the theatre showed a gross that would allow us to pay for the expenses, daily expenses, and keep us in business; not until then would he get the rent. We told him we did not know when that would happen. We hoped it would be soon, and did not want— Q. Did you leave him with that thought finally? A. I did, that is right."

No attempt was made by the lessor to collect the rent of February 18, but a few days after the March rent became due, Frankel, lessor's attorney, called at the theatre and wanted to know about the rent. On March 23, 1934 a levy was made upon the property in the theatre, which sometime later was sold at a constable's sale for $500, and the net proceeds paid to the lessor. On Saturday, March 24, 1934, the last day for the theatre to be operated by the lessee, the key for the theatre was given by Sobel to Frankel, but what took place at that time the record does not disclose. On the following day, lessor and his attorney, together with lessee's officers and its attorney, met and discussed the situation. On leaving, the lessor said he would notify them that night whether he would operate the theatre or allow them to continue. That evening Frankel informed them that the lessor had decided to take over the theatre. Later on, lessor purchased from the lessee an assignment of its mercantile license.

The lessee bases its right to recover on two general premises: First, upon the promises of the lessor to waive the payment of rent as required by the lease until such time as the income from the theatre was sufficient to pay it, upon the strength of which promises the lessee was induced to continue the operation and to borrow money; second, that the lessor had accepted a surrender of the lease. The main basis of lessee's right of action is that by virtue of the lessor's promises, a new agreement was substituted for the original lease. To establish such an agreement, the proof must be such as would amount to a novation. What constitutes a novation, we have recently discussed in *Le Bar v. Patterson,* 123 Pa. Superior Ct. 491, 187 A. 278. In every novation there are four essential requisites: (1) a previous valid obligation, (2) the agreement of all the parties to the new contract, (3) the extinguishment of the old contract, (4) the validity of the new one; and the burden is upon one who alleges a novation to establish it by proper proof. Viewed in the light of these principles, we are unable to find that the lessee has met the burden of proof. It is clear that at the meeting of the parties held in January, 1934 no definite agreement was made by the lessor to waive any of his rights under the lease; nor does the testimony of what occurred at the meeting held in February rise any higher. At each meeting the lessor demanded payment of his rent and was moved to indulgence by the explanations of the lessee's officers as to efforts being made to place the theatre upon a paying basis. His general statement that "he would go along with us," was not sufficiently definite to justify the conclusion that he had waived the payment of the rent until such time as the theatre showed a gross that would allow expenses to be paid and the lessee kept in business. How can it be said that such indefinite and vague arrangements rise to the status of an agreement? They fixed no time when

the rent would be due, except largely at the will of the lessee, and only in the event that the operations of the theatre were profitable. Under such arrangements, the lessor would be entirely at the mercy of the lessee until the completion of the full term of five years. There is no doubt that a lessor may reduce the amount of rent payable under the terms of a lease, or may postpone the payment due under the lease, but such arrangements must be so precise, clear and definite that the terms of the new agreement are not shrouded in doubt and conjecture. In *Decker v. Seltzer,* 116 Pa. Superior Ct. 58, 176 A. 29, this court held that an alleged oral understanding between the landlord and the tenant that if the tenant would remain on the premises as tenant, he could pay rent in accordance with his means and ability to pay was too vague and indefinite and without the consideration necessary to constitute a novation. See also *Gordon v. Mitchell,* 320 Pa. 277, 182 A. 386. In *Knight v. Gulf Refining Co.,* supra, the present Chief Justice said: "The existence of an oral contract changing the terms of a prior written one must be clearly and positively shown. Its terms must appear definitely from the evidence. The acts of the parties, their conduct and the circumstances and relations existing between them, are all elements to be given due consideration in determining both the existence and terms of such an agreement. We do not wish to imply by this statement that greater evidence is necessary to establish such an oral contract than is required to prove any oral agreement, however. In any case, the mere suggestion or possibility of a contract arising from transactions between the parties is not enough; there must be evidence authorizing more than a conjecture or surmise." A solemn written instrument cannot be nullified upon such vague and indefinite testimony as this record contains.

The proof, upon which a promissory estoppel can be

based, is still more vague and indefinite than the agree-ment to waive the terms of the lease. During the month of January, it was at the lessee's request for indulgence in the payment of the rent that the lessor agreed to go along; had he refused, and the lessee failed to pay the rent, a breach of the terms and conditions of the lease would have occurred entitling lessor to the deposit money. Again in February, prior to the due date of the rent, the strongest inference that can be drawn from the lessor's statements was that he would not exercise his rights under the lease to demand payment of the January and February rent. This statement cannot be extended beyond the period of the rents then due, and it was the duty of the lessee to have made further arrangements, if possible, for the March rent when it became due. Granting that lessee relied upon the promise, made in February, that he would go along, does the mere general statement that lessee borrowed money establish an estoppel? How much was borrowed and what for, the record does not show and the mere continuance of the operation and the payment of such expenses as may have been incurred during a period from February 18 to March 18, is not such prejudice to the lessee as to constitute an estoppel, and thus pre-vent the lessor from exercising his rights under the lease.

The principle of promissory estoppel has been stated in Restatement, Contracts, §90, as follows: "A promise which the promisor should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promisee and which does induce such action or forbearance is binding if injus-tice can be avoided only by enforcement of the promise." Cited with approval in *Langer v. Superior Steel Corp.*, 105 Pa. Superior Ct. 579, 161 A. 571. It will be ob-served that the action or forbearance exercised must be of a definite and substantial character, and the

promise will be enforced only if injustice cannot be avoided. The continuance of the operation of the theatre for another month under the same conditions as had existed for the two previous months, and the borrowing of money, indefinite in amount, cannot be regarded as such action or forbearance of a definite and substantial character as is contemplated by the rule laid down in Restatement. Coupled with the definite and substantial action or forbearance, is that injustice must result from the failure to comply with the promise. Under the facts of this case, we find no such evidence of injustice as brings the lessee within the rule.

Under lessee's contention that the lessor, by his attorney, had accepted the surrender of the lease, the burden was placed upon it to show such acceptance. "A surrender of demised premises by the tenant during the term, to be effectual, must be accepted by the lessor. The burden of proof is upon the tenant to show such acceptance. He sets it up to relieve himself from his covenant, and must prove it"; *Auer v. Penn*, 99 Pa. 370; *Edmundson v. Singer, S. M. Co.*, 51 Pa. Superior Ct. 545. To meet this burden, the only evidence was the delivery of the key to lessor's attorney, and the taking of possession by the lessor two days later. The key was delivered to lessor's attorney sometime after a demand for the March rent, and as far as the record discloses after a levy was made upon the personal property in the theatre. The only testimony in the record as to the delivery of the key was elicited from Frere, who was not present at the time of its delivery. Sobel, who delivered the key to Frankel, gave no testimony concerning the delivery of the key. As to whether the lessee finally decided to abandon the theatre and to deliver the key to lessor's attorney or that the attorney demanded the key for the protection of the property, which had been levied upon, the record is silent. The discussion on March 25 wholly related to whether the

lessor should permit the lessee to continue to occupy the theatre, and it does not appear that any mention was made concerning the delivery of the key. Conceding, but not deciding, that the attorney for the lessor had the right to accept the key as a surrender of the premises, in the absence of proof of authority, it cannot be extended to authorize him to waive the lessor's right to retain the money deposited for the faithful performance of the lease. The record does not contain a single reference to the question of the deposit money. The action of the lessor in proceeding with the constable's sale, indicated that the key was not accepted as a surrender of lessor's rights under the lease.

We are of the opinion that the evidence offered by the lessee, as a matter of law, was not sufficient to establish any basis upon which lessee was entitled to a return of the deposit, and it was the duty of the trial court to enter judgment n. o. v. The failure of lessee to pay the rent constituted such a substantial breach of the terms and conditions of the lease as entitled the lessor to retain the deposit.

Judgment reversed and herewith entered for the defendant.